UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ARIANNA R, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20-cv-02736-TAB-TWP |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON PLAINTIFF'S REQUEST FOR REMAND**

**I.     Introduction**

The Administrative Law Judge that decided Plaintiff's application for disability benefits concluded Plaintiff suffered from the following severe limitations: morbid obesity, systemic lupus erythematosus (SLE) with nephritis, borderline personality disorder, and depression/bipolar. Despite these findings and Plaintiff's "long history of lupus," the ALJ denied Plaintiff's application, concluding in relevant part that Plaintiff did not meet or medically equal Listing 14.02(A), which governs immune system disorders generally and SLE specifically. [Filing No. 16-2, at ECF p. 19.] In denying Plaintiff's application, the ALJ specifically observed that despite Plaintiff's claim of disability, "it is clear from the record that the claimant is able to travel internationally, work part-time jobs, and manage her daughter's schedule." [Filing No. 16-2, at ECF p. 21.]

The ALJ's decision is understandable given the paradox of Plaintiff travelling with her boyfriend to Toronto[1] and Cancun while also claiming to be disabled. Yet a closer examination of the ALJ's decision reveals that the ALJ failed to adequately explain why Plaintiff did not meet or equal Listing 14.02(A), such that remand is appropriate.[2]

## II.     Plaintiff's Medical and Employment History

Plaintiff claims she has been disabled since April 5, 2017. Her relevant medical history dates back to May 3, 2016, when she saw Dr. Christen Prible, an internist at Southwest Health Center and her primary care doctor, to complete return-to-work paperwork. Plaintiff complained of intermittent pain in her hips, lower back, and sometimes her knees, in addition to morning stiffness lasting up to an hour. Dr. Prible's diagnostic impression included SLE, lupus nephritis, knee pain, low back pain, and allergic rhinitis. [Filing No. 16-7, at ECF p. 33.] Plaintiff had many additional visits with Dr. Prible in 2016, and in subsequent years, to address a variety of matters such as Plaintiff's medications, ongoing pain, her depression, cough and congestion, and problems sleeping. [Filing No. 16-7, at ECF p. 303-41.]

Plaintiff also was seen by Dr. Jonathan Bazeley, a nephrologist, in 2016 and 2017. During these visits, Plaintiff's complaints included ongoing fatigue, excessive sleeping without feeling rested, joint and back pain, swelling in her legs, headache, blurred vision, and pain in her skin that was at least in part triggered by sun exposure despite wearing sunblock. [Filing No. 16-7, at ECF p. 59, 67, 77, 101, 107.] Plaintiff also was treated in 2016-18 by Dr. James Cohen, a

---

[1] Although there is a record in the file that indicates Plaintiff traveled to Europe [Filing No. 16-8, at ECF p. 287], Plaintiff's testimony at the hearing was that she traveled to Toronto (not Europe) in addition to Cancun. [Filing No. 16-2, at ECF p. 44.]

[2] Plaintiff raises other challenges to the ALJ's decision. Given the Court's determination that remand is appropriate based upon the ALJ's failure to provide any analysis of Listing 14.02(A), the Court need not consider these challenges. On remand, however, the ALJ is encouraged to consider these additional issues as well.

rheumatologist, for her SLE, who continued her on the medications Prednisone, CellCept, and Plaquenil.  [Filing No. 16-7, at ECF p. 55-66, 98-99, 356-67, and 399-400.]

Plaintiff also was seen by Dr. Andrew O'Brien, another internist at Southwest Health Center.  This occurred in May of 2017 as the result of new low back pain aggravated with movement, lying down, and standing, which radiated into Plaintiff's hips.  [Filing No. 16-7, at ECF p. 13.]  Dr. O'Brien's examination revealed lower back paraspinal tenderness, back pain with bilateral straight leg raising but no radiation down the legs, full lower extremity strength and intact sensation, a difficult-to-elicit right patellar reflex but otherwise normal reflexes, and a stable gait with a "somewhat hunched posture."  [Filing No. 16-7, at ECF p. 13-14.]  Dr. O'Brien diagnosed this as a paraspinal muscle strain and recommended continuing the use of diclofenac sodium gel and resting for a few days.  [Filing No. 16-7, at ECF p. 14.]

Plaintiff's treatment also included cognitive behavioral therapy and group therapy between April 2016 and April 2018, during which her mood was often noted to be anxious, dysthymic or depressed, and irritable.  [Filing No. 16-8 at ECF p. 295, 300-28.]  Plaintiff and her boyfriend also started couples' therapy in September 2017.  [Filing No. 16-8, at ECF p. 291-92.]  By May 2018, they reported some improvement in their relationship.  Plaintiff appears to have resumed cognitive behavior therapy and group therapy in January 2019, which continued through October 2019.  [Filing No. 16-9, at ECF p. 88-103, 116-42.]

In April 2018, state-agency physician J.V. Corcoran, M.D., found that Plaintiff's SLE was not severe because it was "controlled on medication."  [Filing No. 16-3, at ECF p. 5-6.]  In August 2018, state-agency physician M. Ruiz, M.D., affirmed Dr. Corcoran's opinion.  [Filing No. 16-3, at ECF p. 20-23]

In April 2018, state-agency psychologist Ken Lovko, Ph.D. found that Plaintiff's mental impairments were severe, but did not meet or equal a listing. [Filing No. 16-3, at ECF p. 32.] In August 2018, state-agency psychologist Joelle Larsen, Ph.D., affirmed Dr. Lovko's findings. [Filing No. 16-3, at ECF p. 45.]

At the November 26, 2019, hearing before the ALJ, Plaintiff testified that she lived with her grandmother, her parents, and her daughter, was able to interact with school staff for her daughter, but her anxiety made it hard "to do like back-to-school night." [Filing No. 16-2, at ECF p. 38.] On such occasions, Plaintiff explained that her heart starts to race and she feels "like I'm going to vomit and have to go home." [Filing No. 16-2, at ECF p. 38.]

Plaintiff testified that on some days she is so exhausted that even lifting her leg to go up or down the stairs would be too much for her, and she has to stop and sit on the stairs. [Filing No. 16-2, at ECF p. 40.] On days like that, Plaintiff's father would ensure that Plaintiff's daughter got up for school, had breakfast, and got to the bus. Plaintiff was able to drive three or four times a week, such as to pick her daughter up from school after play rehearsals. Plaintiff testified that she had so much pain in her shoulders and hips, in addition to shortness of breath and fatigue, that there were days that she would be winded just showering, and on days that she showered and washed her hair, she was not able to then brush her hair without help. [Filing No. 16-2, at ECF p. 42.] Plaintiff was able to do some house chores by planning them out and taking breaks. However, when she can, Plaintiff naps for two hours a day. [Filing No. 16-2, at ECF p. 56.] She cries every day. [Filing No. 16-2, at ECF p. 62.]

Asked to describe the pain that she feels from lupus, Plaintiff stated:

My skin feels like it's on fire and has ants crawling on the inside probably half of
the time of my life. My joints, I wake up and I don't know if my joints are going
to function or not. I don't know if I'll be able to open and close my hands that
day. I don't know if I'll have a headache that I won't be able to function.

4

[Filing No. 16-2, at ECF p. 60-61.]

The most recent medical records indicate that Plaintiff saw Dr. Prible again on January 15, 2019, for depression and bipolar disorder. [Filing No. 16-9, at ECF p. 48.] Plaintiff reported that the medication Seroquel helped her bipolar symptoms. However, as reflected elsewhere in her medical records, Plaintiff was inconsistent in taking her medications (sometimes due to insurance and Medicaid issues), and this time she had not taken her Lexapro for a week. As a result, Plaintiff was not doing well with her depression. [Filing No. 16-9, at ECF p. 48.] Dr. Prible's January 15, 2019, entry further states, "tried to go back to work but had a lot of pain. Went and saw Dr. Bazeley, kidneys not doing as well and so in Lupus flare." [Filing No. 16-9, at ECF p. 48.]

As for employment, prior to April 5, 2017 (the date Plaintiff alleges she became disabled), Plaintiff worked at Amazon as an order picker and at Steak 'n Shake as a server and then as a shift lead. [Filing No. 16-2, at ECF p. 46-52.] After her alleged onset date, Plaintiff worked at Famous Dave's as a host and server, but was not able to "keep up" physically and emotionally so she quit. [Filing No. 16-2, at ECF p. 46]. Plaintiff thereafter worked at Panera Bread as a front-end cashier, and in the bakery and as a stocker but "didn't do very well" there. [Filing No. 16-2, at ECF p. 47-48.]

### III.    The Administrative Decision

Plaintiff filed her application for disability benefits on January 26, 2018. [Filing No. 16-2, at ECF p. 16.] The application was denied initially and upon reconsideration. The ALJ then held a video hearing, at which Plaintiff, who was represented by counsel, testified along with a vocational expert. The ALJ found that Plaintiff was not disabled as defined in the Social Security Act. [Filing No. 16-2, at ECF p 16-27.]

In reaching this conclusion, the ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 5, 2017. At step two, the ALJ listed Plaintiff's severe impairments as morbid obesity, systemic lupus erythematosus with nephritis, borderline personality disorder, and "depression/bipolar." [Filing No. 16-2, at ECF p. 19.] At step three, the ALJ concluded that Plaintiff did not meet or equal the severity of one of the listed impairments. Proceeding to Plaintiff's residual functional capacity, the ALJ concluded Plaintiff could perform sedentary work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, and crawling; no exposure to extreme cold or heat, vibration or vibrating tools, unprotected heights, or moving mechanical parts; no work in direct sunlight; only low-stress work, defined as simple, routine tasks in an environment free from fast-paced production work, such as assembly work wherein all tasks must be completed within strict timeframes, with only simple work-related decision[-]making and few, if any, work place changes; occasional contact with supervisors and incidental contact with coworkers and the general public; and a sit/stand option, at-will, at the workstation, provided that it would not take her off task more than 10% of the workday – essentially jobs that can be performed either sitting or standing at the individual's option. [Filing No. 16-2, at ECF p. 21.]

At step four, the ALJ concluded that Plaintiff was unable to perform any past relevant work.[3] Proceeding to step five, the ALJ concluded that Plaintiff could perform other jobs that existed in significant numbers in the national economy, such as assembler, touch up screener,

---

[3] Plaintiff was 30 years old on her alleged onset date, had a high school education, and as discussed had past relevant work as an order picker, a food server, and a restaurant manager trainee. [Filing No. 16-2, at ECF p. 25.]

6

and finisher. [Filing No. 16-2, at ECF p. 26.] Accordingly, the ALJ concluded Plaintiff was not disabled as defined in the Social Security Act. The Appeals Council affirmed the ALJ's decision, and Plaintiff then appealed to this Court.

**IV.     Discussion**

Plaintiff's lead and most persuasive argument on appeal is that the ALJ erred in concluding that Plaintiff failed to meet or equal Listing 14.02(A). Plaintiff contends that the ALJ's discussion on this point "amounts to nothing more than a conclusory statement that none of Plaintiff's body systems are affected by her lupus and that the other elements of Listing 14.02 (A) or 14.02 (B) are not met." [Filing No. 28, at ECF p. 28.] Thus, the first step in this Court's analysis is to examine precisely what the ALJ said.

> Specifically, the ALJ stated:
>
> The claimant's lupus fails to meet or medically equal the criteria of section 14.02 (A) or (B) of category 14.01 of impairments. The evidence fails to reveal joint involvement, as described under the criteria in section 1.00; or muscle involvement, as described under the criteria in 14.05; or ocular involvement, as described under the criteria in 3.00; or cardiovascular involvement, as described under the criteria in 4.00; or digestive involvement, as described under the criteria in 5.00; or renal involvement, as described under the criteria in 6.00; or hematologic involvement, as described under the criteria in 7.00; or skin involvement, as described under the criteria in 8.00; or neurological involvement, as described under the criteria in 11.00; or mental involvement, as described in the criteria in 12.00 OR lesser involvement of two or more organs/body systems listed in paragraph A, with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. The record fails to reveal a moderate level of severity involving at least one of the organ/body systems. Accordingly, the undersigned finds the claimant's lupus fails to meet or equal listing level severity.

[Filing No. 16-2, at ECF p. 20.]

While the ALJ correctly listed the category of impairments at issue, she wholly failed to discuss them in any way. Plaintiff's medical history, set forth above, and as set forth in more

7

detail in her medical records, belies the suggestion that Plaintiff's lupus has not affected her body systems.

But wait. The Commissioner argues that none of this matters. The Commissioner asserts that this argument is foreclosed because, as noted above, two state agency physicians reviewed the record and found not only that Plaintiff's SLE did not meet or equal a listing, but that the impairment was not even severe enough to interfere with her basic work activities. Relying on cases such as *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), and *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990), the Commissioner states that these state agency opinions constitute substantial evidence that Plaintiff did not meet or equal a listing. [Filing No. 25, at ECF p. 5.]

Plaintiff adequately parries the Commissioner's preemptive salvo. Plaintiff correctly points out that the most recent state agency physician opinion finding that Plaintiff's lupus was non-severe was on August 6, 2018 [Filing No. 16-3, at ECF p. 49], and that the medical evidence incorporated at the hearing as Exhibits 9F through 15F [Filing No. 16-9 at ECF p. 2-142] was submitted by Plaintiff *after* state agency review. Dr. Brazeley's treatment notes, mentioned above, contain significant findings pertinent to a review of Listing 14.02. Moreover, asking this Court to rely on state agency physicians to foreclose Plaintiff's argument ignores an important fact: the ALJ took issue with those opinions. Specifically, the ALJ found that the state agency medical opinions "are not persuasive" because evidence at the hearing "shows the claimant is more limited than opined by the consultants due to lupus flare-ups." [Filing No. 16-2 at ECF p. 25.] *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (*citing SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)) (forbidding an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced).

8

Accordingly, this Court declines to foreclose Plaintiff's argument based upon findings by two state agency physicians that did not have the opportunity to consider important medical evidence, particularly given that the ALJ herself did not find key portions of the physicians' opinions persuasive. The question then becomes whether the evidence could support a finding that Plaintiff's symptoms met Listing 14.02 such that remand would be appropriate. The Court answers this question affirmatively.

There are two separate ways to meet Listing 14.02. To meet the first option, Listing 14.02(A), an individual must have systemic lupus erythematosus, as described in Listing 14.00(D)(1), with involvement of two or more organs or body systems and the following: (1) one of the organs/body systems involved to at least a moderate level of severity; and (2) at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). When evaluating lupus, Listing 14.00(D)(1)(a) provides that major organ or body system involvement can include: respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).

Plaintiff presents a viable argument that at least three body systems—skin, renal, and mental—are affected by Plaintiff's lupus and involved to at least a moderate level of severity. As for skin, Plaintiff complained of photosensitive skin rash to her nephrologist [Filing No. 16-7 at ECF p. 59] and testified before the ALJ that heat and humidity triggered painful rashes.[4]

---

[4] The ALJ noted Plaintiff did not "present with lupus rash at the hearing." [Filing No. 16-2, at ECF p. 22.] However, the ALJ did not otherwise address evidence regarding Plaintiff's rash.

[Filing No. 16-2 at ECF p. 44-45.] In fact, the ALJ expressly included in Plaintiff's RFC "no exposure to extreme cold/heat" and "no work in direct sunlight." [Filing No. 16-2 at ECF p. 21.] Moreover, the major body system involvement listed under Listing 14.00(D)(1)(a) for consideration when evaluating systemic lupus erythematosus specifically includes "skin (photosensitivity)." The record also supports the conclusion that renal involvement is in play. The ALJ recognized systemic lupus erythematosus with nephritis as a severe impairment [Filing No. 16-2 at ECF p. 19], and Plaintiff specifically followed up with a nephrologist for nephritis with a renal biopsy showing diffuse segmental proliferative glomerulonephritis that was treated with CellCept. [Filing No. 16-7 at p. ECF 67.] A third body system—mental health—is similarly affected. Plaintiff's medical records document her mental health issues back to April 2016 [Filing No. 16-8 at ECF p. 288-329], and once again the ALJ included several mental health-related limitations in Plaintiffs RFC.

      Given the foregoing evidence suggesting that Plaintiff met Listing 14.02(A), the Court next addresses whether there is evidence to support the finding that there are at least two of the constitutional symptoms or signs of lupus, consisting of severe fatigue, fever, malaise, or involuntary weight loss. The record documents both severe fatigue and malaise. Plaintiff's treatment records indicate that Plaintiff complained of significant fatigue limiting her activities. [Filing No. 16-7 at ECF p. 33, 59.] Plaintiff testified that she was so fatigued that even lifting a television remote or chewing her food was frequently difficult. [Filing No. 16-2 at ECF p. 59-60.] The record also is replete with Plaintiff's complaints of headache, "brain fog," and a "cloudy" feeling head; low-grade fevers four to five times a week; joint pain; feeling achy; a "rumbly" stomach and feeling as though she might throw up; and being exhausted and unable to keep her eyes open more than 10 minutes at a time. [Filing No. 16-2, at ECF p. 61, 62; Filing

No. 16-9 at ECF p. 107.] This evidence supports a finding of fatigue and malaise, which would satisfy Listing 14.02(A).

It is perhaps understandable why the ALJ was tempted to deny Plaintiff's application. As noted at the outset of this order, in rejecting Plaintiff's claim for benefits the ALJ specifically observed that despite Plaintiff's claim of disability, Plaintiff twice traveled internationally. [Filing No. 16-2, at ECF p. 21.] Discussing Plaintiff's trip to Cancun with her boyfriend, the ALJ wrote, "In October 2018, she reported they enjoyed their trip to Cancun." [Filing No. 16-2, at ECF p. 23.] The ALJ also observed that Plaintiff worked part-time jobs and managed her daughter's schedule. Yet another valid concern of the ALJ is seen in her statement, "Notably, the claimant's boyfriend has expressed concern regarding the claimant's work ethic, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments."[5] [Filing No. 16-2, at ECF p. 24.]

This Court will not re-weigh the evidence or substitute its judgment for that of the ALJ, *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Moreover, the Court is fully aware that ALJs are not required to name and discuss every listing in their written decisions. *Wilder v. Kijakazi*, No. 21-1606, __ F.4th __, __, 2022 WL 34780, at *6 (7th Cir. Jan. 4, 2022). Nevertheless, as stated in *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th. Cir. 2004), "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." While the ALJ in the case at bar specifically mentioned Listing 14.02, she merely regurgitated the requirements of the listing without analyzing them.

---

[5] Plaintiff takes issue with this statement by the ALJ, noting it is an uncited reference and arguing that the ALJ's use of this purported evidence is problematic for a number of reasons. [Filing No. 27, at ECF p. 3.]

The Commissioner concedes that the ALJ did not consider Plaintiff's fatigue in detail. [Filing No. 25, at ECF p. 6.] However, like the ALJ, the Commissioner points to Plaintiff's "travel to Europe and Cancun with her boyfriend" in an effort to undermine Plaintiff's claim. [Filing No. 25, at ECF p. 6.] In the Court's view, it is not particularly surprising that an individual who claims to be severely fatigued might want (and need) a vacation. Moreover, the ALJ asked Plaintiff about her travel. She said that she drove to Toronto for a three-day trip and that her boyfriend did 99% of the driving. [Filing No. 16-2, at ECF p. 44.] While there, she was so tired that most of the time she had to go back to her hotel room a little bit earlier than her group. [Filing No. 16-2, at ECF p. 45.] Plaintiff flew with her boyfriend to Cancun. During the week that she was there, the humidity gave her a rash that felt like her skin was "on fire" and that ants were "crawling" on her. [Filing No. 16-2, at ECF p. 44-45.] The Court agrees with Plaintiff that the ALJ's suspicions regarding her claim of severe fatigue [Filing No. 16-2, at ECF p. 24] "is really a thinly veiled credibility analysis, raising other concerns." [Filing No. 27, at ECF p. 3.] To be sure, it is entirely appropriate for the ALJ to consider a claimant's subjective complaints and the intensity and persistence of those symptoms and question whether her impairments could reasonably be expected to produce such symptoms in light of other factors, including the claimant's daily activities. But as Plaintiff correctly notes, "[t]he ALJ's suspicions regarding credibility don't double for valid analysis of a listing in an entirely separate section." [Filing No. 27, at ECF p. 4.] Accordingly, remand is appropriate.

**V.     Conclusion**

The ALJ found that Plaintiff had a number of severe limitations and a long history of lupus.  Ultimately, however, the ALJ held that Plaintiff did not meet or medically equal Listing 14.02(A).  For the reasons set forth above, that the ALJ failed to adequately explain why Plaintiff did not meet or equal this Listing.  Merely mentioning the Listing's requirements, without any analysis of those requirements, does not suffice given the evidence in the record that suggests Plaintiff may indeed satisfy Listing 14.02(A).  To the extent that the ALJ believes Plaintiff's complaints are not credible based upon her travel or other activities, the ALJ must engage in an appropriate analysis and evaluation of Plaintiff's description of her impairments, in comparison to her daily activities, medication, treatment, limitations, and other factors, to determine the extent to which the symptoms reasonably limit Plaintiff's ability to perform work-related activities.  Perhaps such evidence ultimately will be Plaintiff's undoing.  That determination, however, is for the ALJ in the first instance, and must be based on substantial evidence.  Accordingly, Plaintiff's request for remand is granted.  [Filing No. 23.]

Date: 1/13/2022

_____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution:

Eric Adam Farr
KELLER & KELLER
efarr@2keller.com

Nicholas Thomas Lavella
KELLER & KELLER
nlavella@2keller.com

Matthew Frederick Richter
KELLER & KELLER LLP
mrichter@2keller.com

Alison T. Schwartz
SOCIAL SECURITY ADMINISTRATION
alison.schwartz@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov